**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **PET-AG, INC.**, a Delaware corporation, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-2047 |
| | Judge _____ |
| **REEFTEC SYSTEMS, LLC**, a Nevada limited liability company, **BRIAN GYSEGEM**, a natural person, and **JOHN DOES 1-10**, individually or as corporations/business entities, | Magistrate Judge _____ |
| | Jury Trial Demanded |
| Defendants. | |

## COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C §§ 1114, 1125(A), AND RELATED STATE CLAIMS

Plaintiff Pet-Ag, Inc. ("Pet-Ag" or "Plaintiff"), brings this action against Defendants Reeftec Systems, LLC, Brian Gysegem, and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) violation of the Illinois Uniform Deceptive Trade Practices Act; (4) common law trademark infringement; and (5) tortious interference with existing contracts and business relationships. These claims arise from Defendants' misappropriation of Pet-Ag's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Pet-Ag's trademarks. In support of its complaint, Pet-Ag alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Pet-Ag is a corporation, organized under the laws of Delaware, with its principal place of business in Hampshire, Illinois.

2.      Reeftec Systems, LLC ("Reefec") is a corporation organized under the laws of Nevada.  Reeftec operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "R T S" (the "Amazon Storefront").  The Amazon Storefront can be accessed at https://www.amazon.com//sp?seller=A2DNA6G6IGQS5N.  Reeftec does business throughout the United States through the "R T S" storefront, including in Illinois.

3.      The Amazon Storefront provides that the "Business Name" of the operator of the storefront is "Reeftec Systems LLC," and that the "Business Address" of Reeftec is "2880 Bicentennial Pkwy Suite 100 #2023, Henderson, NV 89044."  However, this address appears to be a private mailbox at a shipping center business called PostNet, and not a place of business of Reeftec.  Corporate documents filed for Reeftec identify only a single managing member and state that the address of the managing member is 3000 Barrett Springs Avenue, Henderson, NV 89044.  Accordingly, upon information and information, Reeftec's principal place of business is located at 3000 Barrett Springs Avenue, Henderson, NV 89044.

4.      Brian Gysegem ("Gysegem") is a natural person who, upon information and belief, resides at 3000 Barrett Springs Avenue, Henderson, NV 89044.  Gysegem assists in the operation of the Amazon Storefront and does business throughout the United States through the Amazon Storefront, including in Illinois.

5.      Corporate documents that have been filed for Reeftec identify Gysegem as the sole managing member of Reeftec and do not identify any other individuals as members or officers of Reeftec.  Accordingly, upon information and belief, Gysegem is in control of, the sole managing member of, and primarily responsible for the actions of Reeftec.

6.     Pet-Ag asserts claims against Gysegem in his individual capacity and also in his capacity as a corporate officer of Reeftec.  Upon information and belief, both Gysegem in his individual capacity and Reeftec assist in the operation of the Amazon Storefront.

7.     Alternatively, as the sole managing member of Reeftec, Gysegem directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Pet-Ag's trademarks by Reeftec.  Accordingly, Gysegem is personally liable for infringing activities carried out by Reeftec without regard to piercing the corporate veil.

8.     Alternatively, upon information and belief, Reeftec follows so few corporate formalities and is so dominated by Gysegem that it is merely an alter ego of Gysegem.  This is reflected, in part, by the facts that: (1) on the Amazon Storefront that it operates, Reeftec lists its "Business Address" as a private mailbox; and (2) Reeftec had to file a certificate of reinstatement in May 2020 after it was suspended for failure to comply with Nevada law.  Accordingly, Pet-Ag is entitled to pierce the corporate veil of Reeftec. and hold Gysegem personally liable for the infringing activities of Reeftec.

9.     Pet-Ag believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Pet-Ag.  Therefore, Pet-Ag sues these defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Pet-Ag will seek leave to amend this Complaint accordingly.  If Pet-Ag does not identify any such parties, it will dismiss these defendants from this action.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  Pet-Ag's federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a), and its claims arising under the laws of the State of Illinois are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Illinois and established sufficient minimum contacts with Illinois by, among other things, advertising and selling infringing products bearing Pet-Ag's trademarks to consumers within Illinois through a highly interactive commercial website, through the regular course of business, with knowledge that Pet-Ag is located in Illinois and is harmed in Illinois as a result of Defendants' sales of infringing products to Illinois residents.  Defendants know that Pet-Ag is located in Illinois, among other reasons, because they received cease-and-desist letters informing them that Pet-Ag is located in Illinois and is harmed in Illinois by their unlawful actions.  Pet-Ag's claims arise out of Defendants' substantial and regular sales of infringing products bearing Pet-Ag's trademarks to Illinois residents.

12.     Venue is properly found in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Pet-Ag & Its Trademarks

13.     Pet-Ag manufactures and distributes pet and animal feeding and health products.

14.     Pet-Ag was originally founded as a division of Borden, Inc.  Pet-Ag's first product—a milk replacement powder named Esbilac®–became the world's first commercially prepared, nutritionally balanced formula for puppies.

15.     Pet-Ag not only provides products for dogs and cats, it also makes key feeding and health products for many other species, including: Foal-Lac® for equines; Bene-Bac® Plus for birds and reptiles, and the Zoologic® line of formulas for wildlife and exotic animals.  Pet-Ag's products ("Pet-Ag products") are used in the care and feeding of pets and exotic animals all over the world.

16.     Pet-Ag allows its products to be sold to end-user consumers in the United States only by sellers who Pet-Ag has expressly authorized to sell Pet-Ag products ("Authorized Sellers").  These sellers include national pet chains and independent retailers.

17.     Pet-Ag allows Authorized Sellers to sell Pet-Ag products only in approved channels and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Pet-Ag Rules").

18.     Pet-Ag devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By allowing end-user consumers to purchase Pet-Ag products only from Authorized Sellers who are required to follow the quality controls and other requirements in the Pet-Ag Rules, Pet-Ag ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of the Pet-Ag brand.  In the highly competitive markets for pet and animal health products, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

19.     To promote and protect its brands, Pet-Ag has acquired rights to trademarks and registered numerous trademarks with the United States Patent and Trademark Office, including the following (collectively, the "Pet-Ag Trademarks"):

a.  Bene-Bac® (U.S. Trademark Reg. No. 3075370);

b.  Bospro® (U.S. Trademark Reg. No. 0948025);

c.  Boundary® (U.S. Trademark Reg. No. 1019191);

d.  Cat-Sip® (U.S. Trademark Reg. No. 1788940);

e.  DYNE® (U.S. Trademark Reg. No. 1769634);

f.  EMT® (U.S. Trademark Reg. No. 3201047);

g.  Esbilac® (U.S. Trademark Reg. No. 0439707);

h.  Fawn-Lac® (U.S. Trademark Reg. No. 5763928);

i.  Fermacto® (U.S. Trademark Reg. No. 0643350);

j.  Foal-Lac® (U.S. Trademark Reg. No. 1043942);

k.  Fresh n' Clean® (U.S. Trademark Reg. Nos. 1635271, 1433494, 1638093, 1644222, 2984276);

l.  GME® (U.S. Trademark Reg. No. 2013508);

m.  KMR® (U.S. Trademark Reg. No. 0961028);

n.  Linatone® (U.S. Trademark Reg. No. 0823586);

o.  Mirra Coat® (U.S. Trademark Reg. No. 0768257);

p.  Multi-Milk® (U.S. Trademark Reg. No. 3057034);

q.  Pet-Ag® (U.S. Trademark Reg. No. 73683523);

r.  PetAg® (U.S. Trademark Reg. No. 1831054);

s.  PetLac® (U.S. Trademark Reg. No. 2608762);

    t.   PET Pectillin® (U.S. Trademark Reg. No. 0980872);

    u.   Prozyme® (U.S. Trademark Reg. No. 2318171);

    v.   Shed Relief® (U.S. Trademark Reg. No. 3162728);

    w.   Trophy® (U.S. Trademark Reg. No. 1701351); and

    x.   Zoologic® (U.S. Trademark Reg. No. 1843830).

20.    The registration for each of the Pet-Ag Trademarks is valid, subsisting, and in full force and effect.

21.    Further, Pet-Ag's right to use many of the Pet-Ag Trademarks has become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, Pet-Ag received no final legal decision issued against the trademarks, and Pet-Ag timely filed a Section 15 Declaration describing the trademarks' use. Accordingly, these trademarks serve as conclusive evidence of Pet-Ag's ownership of the marks and of its exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

22.    Pet-Ag actively uses and markets the Pet-Ag Trademarks in commerce.

23.    Consumers recognize the Pet-Ag Trademarks as being associated with Pet-Ag products.

24.    Due to the quality and exclusive distribution of Pet-Ag's products, and because Pet-Ag is recognized as the source of high-quality products, the Pet-Ag Trademarks have enormous value.

**Online Marketplaces and the Challenge They Present to Pet-Ag Product Quality**

25.    E-commerce retail sales have exploded over the past decade. From 2009 to the end of 2021, the percentage of total retail sales in the United States that were completed through e-

commerce channels rose from 3.8% to 12.9%. *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (February 18, 2022), https://fred.stlouisfed.org/series/ECOMPCTSA.

26.     In 2021 consumers spent $870 billion on e-commerce sales, a 14% increase from 2020. The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021. *See* Jessica Young, *U.S. ecommerce grows 14.2% in 2021*, Digital Commerce 360 (February 18, 2022), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

27.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

28.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them. Instead, consumers must trust that the product they receive from an online order will be authentic and of the quality they expect and typically receive from the manufacturer.

29.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller. As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

30.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by

authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016,  https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.   *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

31.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016,  https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019,  https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

32.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance

Committee issued a bipartisan report on the issue. The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms. The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online. *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

33. In January 2020, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods." Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7. The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller." *Id*. at 14-15, 38. To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers." *Id.* at 35.

34. In its 2018, 2019, 2020, and 2021 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit,"

"pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2022), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-9acc-1a89df23d0f3.pdf  Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

35.  Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers and their pets—particularly when, as here, a brand owner's products are ingested by animals and pets.

36.  The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

37.  When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the brand owner.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the brand owner's oversight and with the brand owner's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

11

38.    For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

39.    When a consumer purchases on an online marketplace and receives a product that is damaged, defective, or of otherwise poor quality, the consumer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

40.    Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products:  online product reviews.  Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which often remain permanently attached to products, will often criticize the brand rather than the marketplace seller that sold the product.

41.    Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

42.    Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, one survey found that consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by brand owners.  Moms Place Trust in Other Consumers, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.    Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online

12

marketplaces. Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

43. Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings. According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product. Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011, https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

44. Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy. Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

### Pet-Ag's Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written by Consumers Who Purchased Poor Quality Products From Unauthorized Sellers on Online Marketplaces

45. Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product listings. These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

46. Numerous consumers have written negative reviews of Pet-Ag products being offered for sale on online marketplaces. In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated

13

Pet-Ag products low "ratings" and complained of receiving products that were damaged, previously used, tampered with, and harmful to pets.

47. For example, Defendants have sold on Amazon the product seen in the screenshot below:




48. As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were harmful to pets, damaged, tampered with, and different and of worse quality than products customers had previously received from veterinarians and pet stores:





⭐⭐⭐☆☆ **Damaged product**
Reviewed in the United States on April 14, 2020
Size: 12 Ounce (Pack of 1) | **Verified Purchase**

This is a great product, good price and good shipping speed...BUT can came significantly dented making seal of lid (once opened) a solid no go. Yes retry disappointed as the shipping box wasn't damaged, so I guess they felt it was ok to ship a damaged can 😞

⭐☆☆☆☆ **Damage**
Reviewed in the United States on July 22, 2019
Size: 12 Ounce (Pack of 1) | **Verified Purchase**
Came damage in the box.



⭐⭐☆☆☆ **Okay price...arrived damp and clumpy**
Reviewed in the United States on August 6, 2019
Size: 12 Ounce (Pack of 1) | **Verified Purchase**
I have purchased this formula for my puppy at the pet store before and it was different from what I received from Amazon. This arrived sealed but the powder is moist and clumpy. (Not normal)

⭐☆☆☆☆ **Made puppies sick**
Reviewed in the United States on October 28, 2019
Size: 12 Ounce (Pack of 1) | **Verified Purchase**
If I could give zero stars I would. I don't know what has changed with this formula but the cans I got from Amazon made my puppies sick with diarrhea, vomiting, bloating and pain.
The powder was a different color then the can I got at the vets and it was grainier too.
I'll never buy the brand again. Do yourself a favor and buy a better replacer for your pups.
I returned my order.

49.     Below is a screenshot of another Pet-Ag product that Defendants have sold on Amazon:




50.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were previously used and tampered with:







16

51.     Below is a screenshot of another Pet-Ag product that Defendants have sold on Amazon:



52.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were damaged, tampered with, missing components, very old and spoiled, and harmful to pets:







53. The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Pet-Ag products listed on Amazon that Defendants sell through their Amazon Storefront.

54. Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review. Given that Defendants have sold a high volume of products bearing the Pet-Ag Trademarks on Amazon and are not subject to Pet-Ag's quality controls, however, it is exceedingly likely that some of the foregoing negative reviews—and the many other similar negative reviews of Pet-Ag products that Defendants have sold on Amazon— were written by customers who purchased products bearing the Pet-Ag Trademarks from Defendants.

**Pet-Ag Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Presented By Online Marketplaces and Ensure Customers Receive the Genuine, High Quality Products They Expect From Pet-Ag**

55. The above reviews show how sales of poor quality Pet-Ag products disappoint Pet-Ag's consumers and cause significant harm to the reputation and goodwill of Pet-Ag and its brands. To protect itself and consumers from these harms, Pet-Ag implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

56. The goals of Pet-Ag's quality control program are to minimize the likelihood that poor quality products reach consumers and ensure that consumers who purchase Pet-Ag products,

18

including consumers who buy online, receive the high quality products and services they expect from products sold under the Pet-Ag name. By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Pet-Ag Trademarks.

57. Pet-Ag's ability to exercise quality controls is particularly important for the products it sells because many of Pet-Ag's products are ingested by animals and there may be health and safety risks associated with products that have not been properly inspected, stored, or handled.

58. Pet-Ag abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

59. Pet-Ag's ability to exercise its quality controls is essential to the integrity and quality of Pet-Ag products, as well as the value of the Pet-Ag Trademarks and other intellectual property.

**Authorized Sellers May Sell Pet-Ag Products Only Through Specific Channels and Must Adhere to Pet-Ag's Quality Control and Customer Service Requirements**

60. Pet-Ag maintains strict quality controls over Pet-Ag products by allowing Pet-Ag products to be purchased by end-user consumers only from Authorized Sellers. Pet's Authorized Sellers include Authorized Distributors, Authorized Resellers, and Authorized Retailers.

61. All of Pet-Ag's Authorized Sellers are permitted to sell Pet-Ag's only in certain channels and are required to abide by the Pet-Ag Rules. Thus, every Authorized Seller that sells Pet-Ag products is subject to Pet-Ag's quality control requirements.

62. Pet-Ag carefully vets prospective Authorized Sellers to ensure that only those applicants with a reputation for and a commitment to quality are permitted to become Authorized Sellers of Pet-Ag products.

63.     The Pet-Ag Rules require Authorized Sellers to purchase Pet-Ag products and services only from Pet-Ag directly or from Authorized Distributors, per the applicable policy. This restriction ensures that the chain of custody can be established for all Pet-Ag products sold to consumers by Authorized Sellers, and thus prevents unsafe or unsanitary products, secondhand goods, or other low quality products from entering into the distribution chain.

64.     The Pet-Ag Rules also limit to whom and where Authorized Sellers may sell Pet-Ag products. To prevent persons outside of Pet-Ag's quality controls from acquiring and reselling Pet-Ag products, the Pet-Ag Rules prohibit Authorized Sellers from selling Pet-Ag products to any third party who is not an Authorized Seller and who intends to resell the products. Authorized Sellers are permitted to sell Pet-Ag products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

65.     Given the many perils of unauthorized online sales as described above, Authorized Sellers are also prohibited from selling Pet-Ag products on any website they do not themselves own and operate unless they first apply for and receive written approval from Pet-Ag.

66.     These restrictions are essential to Pet-Ag's ability to exercise its quality controls over Pet-Ag products because they prevent unauthorized sellers from obtaining and reselling Pet-Ag Products and allow Pet-Ag to know where all of its products are being sold online by Authorized Sellers. If a quality issue arises through an online sale, Pet-Ag can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately. Pet-Ag is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

67.     In addition to restricting where and how Authorized Sellers can sell Pet-Ag products, the Pet-Ag Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Pet-Ag products.

68.     To ensure that customers receive the genuine and high quality products they expect from Pet-Ag, the Pet-Ag Rules require Authorized Sellers to inspect all Pet-Ag products for any damage, defects, evidence of tampering, and other non-conformance and remove all such products from their inventory.   Authorized Sellers are prohibited from selling damaged or defective products, and are required to report any discovered defects to Pet-Ag to assist it with identifying any product quality issues.

69.     Authorized Sellers must also regularly inspect their inventory for any products that are expired or within 30 days of expiration ("Not-Current Products"), and not sell any Not-Current Products to consumers.

70.     The Pet-Ag Rules also require that Authorized Sellers store Pet-Ag products in a cool dry place, away from direct sunlight, and in accordance with other guidelines issued by Pet-Ag.  These requirements help ensure that Pet-Ag products are stored properly and are not damaged prior to being shipped to the consumer.  Authorized Sellers must also manage product inventory on a "first-in, first-out" (FIFO) basis, with older inventory being sold before newer inventory of the same product.

71.     To avoid consumer confusion and ensure that customers receive genuine Pet-Ag products, Authorized Sellers must sell Pet-Ag products in their original packaging and are prohibited from relabeling, repackaging, or altering Pet-Ag products or any accompanying label, literature, or safety-related information without Pet-Ag's consent.   Authorized Sellers are prohibited from reselling any products that have been returned opened or repackaged.

72.     Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Pet-Ag products, including any serial number, UPC code, or other identifying information.

73.     The Pet-Ag Rules give Pet-Ag the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Pet-Ag products, to ensure their compliance with Pet-Ag's quality control requirements.  During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of all their sources of all Pet-Ag products.

74.     Authorized Sellers also must cooperate with Pet-Ag with respect to any product recall or other consumer safety information dissemination effort conducted by Pet-Ag regarding Pet-Ag products.

75.     The Pet-Ag Rules also require Authorized Sellers to provide various customer services to their customers.  For example, Authorized Sellers must familiarize themselves with the features of all Pet-Ag products kept in their inventory so they can advise customers on the selection and safe use of Pet-Ag products.

76.     Pet-Ag's quality control and customer service requirements are legitimate and substantial and have been implemented so that Pet-Ag can control the quality of goods manufactured and sold under the Pet-Ag Trademarks, to protect consumers as well as the value and goodwill associated with the Pet-Ag Trademarks.

77.     Pet-Ag's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Pet-Ag product they were considering buying was being sold by an Authorized Seller

who is subject to Pet-Ag's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Pet-Ag's quality controls and over whom Pet-Ag is unable to exercise its quality controls.

### Given the Flood of Poor Quality Products Being Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Pet-Ag Imposes Additional Requirements on Its Authorized Sellers Who Sell Online

78.     As shown in the consumer reviews cited above (¶¶ 46-53), Pet-Ag products sold online are more susceptible to quality and authenticity problems as consumers cannot see products before buying them.   These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.

79.     Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Pet-Ag imposes additional quality control requirements on all of its Authorized Sellers who sell Pet-Ag products online.

80.     The Pet-Ag Rules allow Authorized Sellers to sell Pet-Ag products to end-user consumers only through "Permissible Websites" and "Authorized Websites."   These rules allow Pet-Ag to oversee all Authorized Sellers who sell Pet-Ag products online.

81.     A "Permissible Website" is a website that: (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name, and (2) lists the Authorized Seller's mailing address, telephone number, and email address.   Only a small subset of Pet-Ag's Authorized Sellers are permitted to sell Pet-Ag products on Permissible Websites; many Authorized Sellers are not permitted to do so even if they own and operate a website that meets the criteria of a Permissible Website.

82.     Authorized Sellers must receive prior written approval from Pet-Ag before they can sell Pet-Ag products on any website that does not meet the criteria of a Permissible Website.  To obtain this approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Pet-Ag products, and list the specific websites where they wish to sell products.  Applicants then undergo vetting by Pet-Ag that includes review of their business operating business record and online review history.  A website that Pet-Ag permits an Authorized Seller to use through this process is called an "Authorized Website."

83.     Online marketplaces, including Amazon, do not qualify as "Permissible Websites" because they are operated by third parties rather than any Authorized Seller.  Accordingly, Authorized Sellers are prohibited from selling on any online marketplace, including Amazon, unless they are vetted by Pet-Ag and specifically approved to sell on an online marketplace.

84.     The Pet-Ag Rules impose numerous additional requirements on Authorized Sellers who sell Pet-Ag products on Permissible Websites or Authorized Websites (collectively, "Authorized Online Sellers").

85.     For example, Authorized Online Sellers must use images of Pet-Ag products that are provided or approved by Pet-Ag and keep product descriptions up to date.  Authorized Online Sellers are also prohibited from advertising any Pet-Ag product they do not carry in their inventory.

86.     The Pet-Ag Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Pet-Ag or another third party.  These requirements allow consumers of Pet-Ag products to understand the nature of the seller from whom they are purchasing and enable consumers to contact the seller if any quality issues arise.  These requirements also allow Pet-Ag to protect the public from the sale

of poor quality or counterfeit Pet-Ag products because it allows for easy detection of any Authorized Online Seller that sells poor quality or counterfeit goods.

87.     Authorized Online Sellers who sell Pet-Ag products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Pet-Ag.  At Pet-Ag's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Website or Authorized Website where Authorized Online Sellers are selling Pet-Ag products.

88.     Unless otherwise approved by Pet-Ag, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Pet-Ag products.  Authorized Online Sellers are also prohibited from using any fulfillment service that could cause customers to receive Pet-Ag products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet Pet-Ag's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Pet-Ag's quality controls.

89.     All websites where Authorized Online Sellers sell Pet-Ag products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to Pet-Ag upon request; and (iii) cooperate with Pet-Ag in investigating negative online reviews related to sales of Pet-Ag products.

90.     In light of the unique quality control challenges presented by online marketplaces like Amazon, and to further Pet-Ag's efforts and ability to assure product quality and adherence to its quality control standards, protect the value and goodwill associated with the Pet-Ag

Trademarks, and prevent consumer confusion, Pet-Ag has approved only one Authorized Seller to sell on the Amazon marketplace ("Authorized Amazon Seller"). By limiting authorized sales of Pet-Ag products on Amazon sales to a single Authorized Seller, Pet-Ag is able to closely monitor its products being sold on Amazon and promptly address any issues directly with its one approved seller.

91.     Pet-Ag's Authorized Amazon Seller was vetted by Pet-Ag to ensure that it meets Pet-Ag's high standards for authorized online sellers. Pet-Ag's Authorized Amazon Seller has a recognized business that meets applicable criteria (i.e. credit, sales history, facility requirements) and an acceptable business operating record, online review history, and customer feedback score.

92.     To obtain authorization to sell Pet-Ag products on Amazon, Pet-Ag's Authorized Amazon Seller entered into a contract in which it agreed to adhere to quality control and customer service requirements that are even more extensive than the requirements that Pet-Ag imposes on its Authorized Online Sellers that sell on other websites.

93.     For example, Pet-Ag's Authorized Amazon Seller is required to apply unique "FNSKU" labels to all Pet-Ag products it provides to Amazon for fulfillment to customers via Amazon's "Fulfillment by Amazon" service and affirmatively "opt out" of Amazon's "commingling" practice. By default, Amazon's policy is to commingle products from different third-party sellers that use Amazon's Fulfillment by Amazon service, such that a consumer ordering from one third-party seller could receive a product provided to Amazon by an entirely different seller. Thus, when commingling is in effect, a consumer who orders from a seller that followed quality controls prior to shipping products to Amazon's fulfillment centers may nonetheless receive a poor quality or counterfeit product that came from a different seller's inventory. Pet-Ag requires its Authorized Amazon Seller to affirmatively opt out of this practice,

26

and incur additional costs by applying FNSKU labels to all Pet-Ag products, to ensure that all consumers who purchase Pet-Ag products from its Authorized Amazon Seller receive genuine Pet-Ag products that have been subject to Pet-Ag's quality controls.

94.     Pet-Ag also requires its Authorized Amazon Seller to conduct a rigorous, four-step inspection process of all Pet-Ag products in its inventory.  This process includes inspections of pallets and cases, multiple inspections of individual products for damage, signs of tampering, and other defects, and a weight integrity check to confirm that identical products have the same weight. The four-step inspection process includes multiple redundant steps, to minimize the likelihood that any product flaw is overlooked.  Any flawed products that are discovered are removed from inventory and are not sold to customers.  Pet-Ag's Authorized Amazon Seller also must audit its employees' compliance with the four-step inspection process at least one per month, keep a written record of its auditing, and promptly take remedial action if any deficiencies are discovered through its auditing.

95.     Pet-Ag's Authorized Amazon Seller is also required to provide Pet-Ag a report each month ("Amazon Performance Report") that includes extensive information about its adherence to Pet-Ag's quality control requirements and feedback received from customers.   Among other information, the Amazon Performance Report must include: (i) the Authorized Amazon Seller's "Order Defect Rate" and "Return Dissatisfaction Rate" as determined by Amazon, which are calculated in part through negative feedback received from the Authorized Amazon Seller's customers and evidence that the Authorized Amazon Seller shipped poor quality products to Amazon fulfillment centers; and (ii) counts of all positive, neutral, and negative written reviews the Authorized Amazon Seller has received from its customers.  The Amazon Performance Report is a critical component of Pet-Ag's quality controls because it allows Pet-Ag to closely monitor its

Authorized Amazon Seller's compliance with its heightened quality controls and take swift remedial action if its Authorized Amazon Seller falls out of compliance. Pet-Ag cannot do this for products sold by any unauthorized sellers on Amazon, such as Defendants.

96. Pet-Ag's Authorized Amazon Seller is also required to have Amazon return any unfillable or unsaleable Pet-Ag products to Pet-Ag or its Authorized Amazon Seller, so the products can be disposed of in accordance with Pet-Ag's instructions rather than disposed of through a different channel where the products could potentially be relisted for sale to unknowing customers.

97. Pet-Ag's Authorized Amazon Seller also must take appropriate steps to address customer feedback and cooperate with Pet-Ag in investigating any negative reviews received from customers. Further, as is the case for all of Pet-Ag's Authorized Sellers, Pet-Ag's agreement with its Authorized Amazon Seller gives it the right to inspect the facilities and records of its Authorized Amazon Seller to ensure it is complying with Pet-Ag's quality control and customer service requirements.

98. The additional quality control requirements that Pet-Ag imposes on its Authorized Online Seller and Authorized Amazon Seller are legitimate and substantial and have been implemented to allow Pet-Ag to carefully control the quality of Pet-Ag products that are sold online and quickly address any quality issues that arise.

99. Pet-Ag's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Pet-Ag products online and on Amazon receive genuine, high-quality Pet-Ag products that abide by Pet-Ag's quality controls. Consumers purchasing Pet-Ag products online and on Amazon would find it relevant to their purchasing

decision to know whether a product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, Pet-Ag's quality controls.

### Pet-Ag Monitors and Audits Its Authorized Online Sellers To Ensure They Comply With Its Quality Control Requirements

100.    Pet-Ag regularly audits its Authorized Online Sellers to ensure they are adhering to its quality control requirements.  Pet-Ag carries out its auditing and monitoring actions pursuant to an internal program called the Pet-Ag Online Quality Control Program ("Auditing Program").

101.    As part of its Auditing Program, Pet-Ag examines a rotating sample of Authorized Websites on a regular basis to ensure that the Authorized Online Sellers who sell through the websites are complying with the Pet-Ag Rules.  During these examinations, Pet-Ag checks to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Pet-Ag or a third party; (iii) do not display any content that could be detrimental to the Pet-Ag and its brands; (iv) do not make any representations regarding Pet-Ag products that are misleading; (v) exclusively contain images of Pet-Ag products and product descriptions that are supplied or authorized by Pet-Ag and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

102.    Pet-Ag also periodically inspects online reviews of Pet-Ag products and Authorized Online Sellers that appear on Authorized Websites.  If Pet-Ag discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor quality Pet-Ag products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Pet-Ag communicates with the responsible Authorized

Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

103.     Pet-Ag also periodically conducts a test purchase of a Pet-Ag product from a rotating sample of Authorized Websites.  If Pet-Ag discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Pet-Ag communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

104.     If Pet-Ag discovers that an Authorized Online Seller is selling Pet-Ag products of poor quality or otherwise not adhering to Pet-Ag's quality control or customer service requirements, Pet-Ag may conduct an investigation to determine the source of the problem.  The Pet-Ag Rules require that Authorized Online Sellers cooperate with Pet-Ag's investigation, permit Pet-Ag to inspect their facilities and records relating to Pet-Ag products, and disclose all information about where they obtained Pet-Ag products.  Based on what its investigation reveals, Pet-Ag has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Pet-Ag products.

**Genuine Pet-Ag Products Come with Pet-Ag's 60-Day Satisfaction Guarantee;
Products Sold By Defendants Do Not**

105.     Pet-Ag also provides customers who purchase genuine Pet-Ag products from Authorized Sellers with the "Pet-Ag Product Promise," which is a 60-day satisfaction guarantee ("Pet-Ag Satisfaction Guarantee").

106.     Under the Pet-Ag Satisfaction Guarantee. a customer is able to receive a replacement product or full refund of the purchase price of a Pet-Ag product within 60 days of the

original purchase date if the customer is dissatisfied with the product for any reason. The complete terms of the Pet-Ag Product Promise can be viewed at https://www.petag.com/product-promise and are incorporated herein.

107. Pet-Ag extends the Pet-Ag Satisfaction Guarantee only to products that were sold by sellers who are subject to Pet-Ag's quality controls. Because products sold by unauthorized sellers are not subject to Pet-Ag's quality controls and Pet-Ag cannot ensure the quality of such products, the Pet-Ag Satisfaction Guarantee does not cover Pet-Ag products sold by unauthorized sellers, including Defendants. Indeed, the Pet-Ag Satisfaction Guarantee specifically states that is "not available for products purchased from unauthorized sellers, including unauthorized Internet websites and unauthorized storefronts on online marketplace websites."

**Defendants Are Not Authorized Sellers and Are Illegally Selling Non-Genuine Products Bearing the Pet-Ag Trademarks**

108. Because the unauthorized sale of Pet-Ag products over the Internet threatens the reputation and goodwill associated with the Pet-Ag Trademarks, Pet-Ag actively monitors the sale of its products online.

109. In the course of this monitoring, Pet-Ag discovered that high volumes of products bearing the Pet-Ag Trademarks were being illegally sold on Amazon through a storefront called "R T S."

110. Through investigation, Pet-Ag identified Defendants as the operators of the "R T S" storefront and the parties who are responsible for the unlawful sale of products bearing the Pet-Ag Trademarks through the "R T S" storefront.

111. Defendants are not Authorized Sellers of Pet-Ag Products are not subject to, and do not comply with, the Pet-Ag Rules or the quality controls that Pet-Ag imposes on its Authorized Sellers.

112.     On July 26, 2021, counsel for Pet-Ag sent a cease-and-desist letter to Defendants via overnight mail.  The letter explained that Defendants are infringing the Pet-Ag Trademarks by selling products through their Amazon Storefront that are materially different from genuine products sold by Pet-Ag's Authorized Sellers and that are not subject to, do not abide by, and interfere with Pet-Ag's quality controls.  The letter also explained that Defendants are tortiously interfering with Pet-Ag's contracts by purchasing products from Distributors, who are prohibited from selling products to persons or entities who are not Authorized Resellers and resell the products.  The letter also informed Defendants that Pet-Ag is located in Illinois, is harmed in Illinois as a result of Defendants' illegal sales of infringing products bearing the Pet-Ag Trademarks, and that Defendants would be subject to personal jurisdiction in Pet-Ag if they continued to engage in their illegal conduct and Pet-Ag filed suit.  Pet-Ag's letter demanded that Defendants permanently cease selling products bearing the Pet-Ag Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

113.     Defendants did not respond to Pet-Ag's July 26, 2021 letter and continued selling products bearing the Pet-Ag Trademarks through their Amazon Storefront.

114.     Pet-Ag sent additional cease-and-desist letters to Defendants on August 5, 2021, August 30, 2021, and February 17, 2022 that repeated the demands in Pet-Ag's July 26, 2021 letter.  Pet-Ag's August 30, 2021 letter also enclosed a draft complaint against Defendants that was prepared for filing in the United States District Court for the Northern District of Illinois.

115.     Defendants have not responded to any of Pet-Ag's cease-and-desist letter and have continued to sell products bearing the Pet-Ag Trademarks through their Amazon Storefront.

116.     Defendants' disregard of Pet-Ag's cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

117.     Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Pet-Ag Trademarks through their Amazon Storefront.  Monitoring software estimates that Defendants have sold more than 2,000 infringing products through their Amazon Storefront for revenue in excess of $35,000.

118.     Upon information and belief, through their storefront on the highly interactive Amazon website, Defendants accept and fulfill orders from Illinois residents for products bearing the Pet-Ag Trademarks and cause substantial quantities of infringing products bearing the Pet-Ag Trademarks to be shipped to persons located in Illinois through the regular course of business.

119.     As of the time of filing, Defendants' Amazon Storefront is called "R T S."  Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID number for Defendants' Amazon Storefront is A2DNA6G6IGQS5N.  Even if Defendants change the name of their Amazon Storefront at some time in the future, their storefront can always be accessed at the following link that includes the storefront's Merchant ID numbers: https://www.amazon.com//sp?seller=A2DNA6G6IGQS5N.

### Defendants Do Not Abide By and Interfere With Pet-Ag's Quality Control Requirements

120.     Defendants do not abide by Pet-Ag's quality control and customer service requirements that Pet-Ag requires Authorized Sellers to follow.

121.     Defendants do not abide by Pet-Ag's quality control requirements because they have not provided Pet-Ag with their business information nor given Pet-Ag an opportunity to vet

them to determine if they meet Pet-Ag's high standards for what it demands of its Authorized Sellers who sell Pet-Ag products on Authorized Websites. Instead, Defendants sell on Amazon without Pet-Ag's authorization or oversight.

122. Defendants do not comply with Pet-Ag's quality control requirements—and interfere with Pet-Ag's quality controls—because they have not disclosed to Pet-Ag where they sell Pet-Ag products online. Defendants also do not provide customer feedback to Pet-Ag that relates to their sales of products bearing the Pet-Ag Trademarks or cooperate with Pet-Ag in investigating negative online reviews relating to their sales of products bearing the Pet-Ag Trademarks, as Authorized Online Sellers are required to do. These actions prevent Pet-Ag from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Pet-Ag Trademarks.

123. Defendants also do not comply with Pet-Ag's quality control requirements—and interfere with Pet-Ag's quality controls—because they: (i) have not disclosed to Pet-Ag where they acquire products that bear the Pet-Ag Trademarks; and (ii) have not given Pet-Ag the right to audit and inspect their facilities and records. As a result, among other things, Pet-Ag cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor quality products; (iii) selling products only in official and unaltered Pet-Ag packaging; (iv) refusing to allow products that have been returned or repackaged to be listed as "new" products; (v) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vi) providing exceptional customer service and responding appropriately to feedback received from customers. Pet-Ag also cannot obtain Defendants'

assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

124.     Customers have written reviews of Defendants' Amazon Storefront in which they complained of receiving products that were damaged, defective, old, and unsuitable for feeding to animals.  These reviews, along with the numerous negative customer reviews of Pet-Ag products that Defendants have sold, *see supra* ¶¶ 47-54, show that Defendants are very likely not carrying out the quality-control inspection, storage, or handling requirements that Pet-Ag requires Authorized Sellers to follow for Pet-Ag products.  Instead, Defendants are likely selling products bearing the Pet-Ag Trademarks to consumers that are damaged, previously used, tampered with, old and spoiled, or of otherwise poor quality rather than removing such products from their inventory.  These sales cause customers to write highly negative reviews of Pet-Ag products that harm Pet-Ag's reputation and hurt the placement of Pet-Ag products in search results.

125.     Defendants also do not comply with Pet-Ag's heightened quality control requirements that apply to its Authorized Amazon Seller, among other reasons, because they: (i) do not provide Pet-Ag with their "Order Defect Rate" and "Return Dissatisfaction Rate" as calculated by Amazon; (ii) do not provide counts of all positive, neutral, and negative reviews they receive from their Amazon customers; and (iii) do not return unfillable or unsaleable products bearing the Pet-Ag Trademarks to Pet-Ag so that Pet-Ag can prevent the products from being potentially relisted for sale to unknowing customers.  As a result, Pet-Ag cannot ensure that unsaleable products originally listed by Defendants are being disposed of rather than sold relisted for sale, and it has no information regarding Defendants' delivery of poor quality products bearing the Pet-Ag Trademarks to Amazon fulfillment centers or Amazon's calculations of poor quality products sold by Defendants.

126. Defendants' failure to abide by the Pet-Ag Rules prevents Pet-Ag from exercising control over the quality of products Defendants sell bearing the Pet-Ag Trademarks. Unlike with its Authorized Online Sellers, Pet-Ag cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

### Defendants Are Infringing the Pet-Ag Trademarks by Selling Products Bearing the Pet-Ag Trademarks That Are Not Subject To, Do Not Abide By, and Interfere With Pet-Ag's Quality Control and Customer Service Requirements

127. For all of the reasons set forth above, the products Defendants sell bearing the Pet-Ag Trademarks fail to adhere to the extensive and legitimate quality controls that Pet-Ag exercises over products bearing the Pet-Ag Trademarks to protect consumers and its brand goodwill.

128. The products bearing the Pet-Ag Trademarks that Defendants sell are not subject to, do not abide by, and interfere with Pet-Ag's quality control and customer service requirements.

129. Because the products Defendants sell are not subject to, do not abide by, and interfere with Pet-Ag's quality control and customer service requirements, the products Defendants sell are materially different from genuine Pet-Ag products.

130. Because the products Defendants sell are not subject to, do not abide by, and interfere with Pet-Ag's quality control and customer service requirements, they are not genuine Pet-Ag products.

131. Defendants' unauthorized sales of products bearing the Pet-Ag Trademarks are likely to, and do, create consumer confusion because consumers who purchase products from Defendants believe they are purchasing genuine Pet-Ag products, when, in fact, they are not.

132. Defendants' unauthorized sales of products bearing the Pet-Ag Trademarks infringe the Pet-Ag Trademarks and diminish their value.

36

133.     Despite these facts, Defendants have sold, and continue to sell, products bearing the Pet-Ag Trademarks through their Amazon Storefront without Pet-Ag's consent.

**Defendants Are Infringing the Pet-Ag Trademarks by Selling Products Bearing the Pet-Ag Trademarks That Do Not Come With the Pet-Ag Satisfaction Guarantee**

134.     As set forth above, genuine Pet-Ag products purchased from an Authorized Seller come with the Pet-Ag Satisfaction Guarantee.  Pet-Ag, however, does not provide the Pet-Ag Satisfaction Guarantee for products purchased from sellers that are not Authorized Sellers because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

135.     Because Defendants are not Authorized Sellers and are thus not subject to Pet-Ag's quality control requirements, the products bearing the Pet-Ag Trademarks that Defendants sell do not come with the Pet-Ag Satisfaction Guarantee.

136.     Because the products Defendants sell do not come with the Pet-Ag Satisfaction Guarantee, they are materially different from genuine Pet-Ag products.

137.     The Pet-Ag Satisfaction Guarantee is a material component of genuine Pet-Ag products.  Consumers considering whether to purchase Pet-Ag products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Pet-Ag Satisfaction Guarantee.  Consumers who purchase Pet-Ag products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Pet-Ag stands behind the product, and that they can get a refund or product replacement if they are not satisfied.

138.     Defendants' unauthorized sale of non-genuine products bearing the Pet-Ag Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Pet-Ag Products that come with the Pet-Ag Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With**
**Pet-Ag's Agreements With Its Authorized Sellers**

139.    As discussed, Pet-Ag allows Pet-Ag products to be sold only by Authorized Sellers.

140.    Pet-Ag has entered into agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Pet-Ag products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

141.    Defendants have sold and are continuing to sell a high volume of products bearing the Pet-Ag Trademarks on the Internet. The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers. Thus, upon information and belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

142.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Pet-Ag.

143.    Defendants have known that Pet-Ag's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

144.    Defendants have known of this prohibition since approximately July 26, 2021. On that date, Pet-Ag mailed a cease-and-desist letter to Defendants explaining that Pet-Ag has agreements with all of its Authorized Sellers that prohibit them from selling Pet-Ag products to any person or entity that is not an Authorized Seller but intends to resell the products.

145.    Pet-Ag's letter also informed Defendants that, by purchasing Pet-Ag products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement

38

between Pet-Ag and its Authorized Seller and were interfering with Pet-Ag's agreements and business relationships.

146.    Pet-Ag's July 26, 2021 letter also advised Defendants that if they continued to acquire products from Pet-Ag's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with Pet-Ag's contracts and business relationships with its Authorized Sellers.

147.    Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Pet-Ag's agreements with its Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

148.    In interfering with Pet-Ag's agreements, Defendants acted without justification and with a wrongful purpose. Defendants purchased Pet-Ag products from Authorized Sellers —and in so doing, instigated a breach of Authorized Sellers' agreements with Pet-Ag—so that Defendants could unlawfully infringe upon and materially damage the value of the Pet-Ag Trademarks by reselling the products on the Internet, thereby committing an independent tort.

149.    Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**Infringing Products Bearing the Pet-Ag Trademarks That Defendants Are Selling Are Being Stored All Around the United States, Including in Illinois**

150.    Individuals and entities who wish to sell products through storefronts on Amazon must enter into a contract with Amazon.com Services LLC ("Amazon.com").

151.    Once a seller has entered into a contract with Amazon.com, the seller must choose whether it will: (i) itself store and ship products; or instead (ii) pay ongoing fees to have Amazon.com store the seller's products at "fulfillment centers" (*i.e.*, warehouses) operated by

Amazon.com, and ship products to consumers once they have been purchased. Amazon offers the second method of storage and fulfillment through a service called "Fulfillment By Amazon."

152. When a seller chooses to use the "Fulfillment By Amazon" service, it retains ownership of the products it stores at Amazon fulfillment centers and can have Amazon.com ship products back to the seller before they have been purchased by customers.

153. However, sellers who use the "Fulfillment By Amazon" are not able to control where Amazon.com stores sellers' products. Sellers who use the "Fulfillment By Amazon" service must agree to "Fulfillment by Amazon Service Terms" set forth in their contract with Amazon.com. These terms provide that Amazon can transfer sellers' products between fulfillment centers without notice or approval from sellers, although sellers are able to see—through their electronic Amazon accounts—where their products are currently being stored at any time.

154. Amazon.com has more than 180 fulfillment centers spread around the United States, including at least one fulfillment center in almost every state. Amazon also promises to customers that all product orders it fulfills—including products that third-party sellers sell to customers while using the "Fulfillment By Amazon" service—will be delivered within two days of purchase. To live up to this promise, Amazon carefully distributes all products it stores for third-party sellers between its fulfillment centers all around the country to ensure products can be delivered within two days of purchase no matter where in the United States they are ordered from.

155. As a result, sellers who use Amazon.com's "Fulfillment By Amazon" service have their products stored all around the country by Amazon.com, including in Illinois, where there are at least eleven Amazon fulfillment centers. *See Amazon to Build 2 Fulfillment Centers in Chicago's South Suburbs*, NBC CHICAGO, June 22, 2020,

https://www.nbcchicago.com/news/local/amazon-to-build-2-fulfillment-centers-in-chicagos-south-suburbs/2293559/.

156.     Defendants are using Amazon.com's Fulfillment By Amazon" service for many of the infringing products bearing the Pet-Ag Trademarks they are selling through their "R T S" storefront, as shown below (with highlighting):

 

157.     Based on these facts, along with the fact that Illinois is a highly populous state, it is exceedingly likely that large quantities of products bearing the Pet-Ag Trademarks owned by Defendants are being stored within Illinois by Amazon.com before the products are purchased by residents of Illinois.

158.     Defendants are intentionally using Amazon.com's vast, established infrastructure to sell and ship infringing products bearing the Pet-Ag Trademarks to consumers nationwide, including customers located in Illinois, and is paying Amazon for the privilege to do so through commissions and fees.  Defendants have not taken any steps to prevent residents of Illinois from purchasing products bearing the Pet-Ag Trademarks from Defendants' Amazon Storefront.

**Pet-Ag Has Suffered Substantial Harm as a Result of Defendants' Conduct**

159.   As set forth above, the unauthorized sale of products bearing the Pet-Ag Trademarks by unauthorized sellers such as Defendants has caused significant harm to the Pet-Ag brand.

160.   When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Pet-Ag.   As such, Defendants' ongoing sale of non-genuine products bearing the Pet-Ag Trademarks harms Pet-Ag and its brands.

161.   Pet-Ag has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

162.   Pet-Ag has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

163.   Pet-Ag is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Pet-Ag Trademarks, causing continued irreparable harm to Pet-Ag's reputation, goodwill, relationships, intellectual property, and brand integrity.

164.   Furthermore, Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

165.   Defendants' willful infringement s of the Pet-Ag Trademarks and continued pattern of misconduct demonstrate intent to harm Pet-Ag.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(A)

166. Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

167. Pet-Ag is the owner of the Pet-Ag Trademarks.

168. Pet-Ag has registered the Pet-Ag Trademarks with the United States Patent and Trademark Office.

169. The Pet-Ag Trademarks are valid and subsisting trademarks in full force and effect.

170. Defendants willfully and knowingly used, and continue to use, the Pet-Ag Trademarks in interstate commerce for the purpose of selling non-genuine products bearing the Pet-Ag Trademarks without Pet-Ag's consent.

171. The products bearing the Pet-Ag Trademarks that Defendants sell are not authorized for sale by Pet-Ag.

172. Defendants' use of the Pet-Ag Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Pet-Ag Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Pet-Ag when they are not.

173. Defendants' use of the Pet-Ag Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Pet-Ag products.

174. The products sold by Defendants are not, in fact, genuine Pet-Ag products. The products sold by Defendants are materially different from genuine Pet-Ag products because,

among other reasons, they are ineligible for the Pet-Ag Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Pet-Ag's quality control requirements.

175.    Defendants' unauthorized use of the Pet-Ag Trademarks has infringed upon and materially damaged the value of the Pet-Ag Trademarks, and caused significant damage to Pet-Ag's business relationships.

176.    As a proximate result of Defendants' actions, Pet-Ag has suffered, and will continue to suffer, immediate and irreparable harm.  Pet-Ag has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

177.    Pet-Ag is entitled to recover its damages caused by Defendants' infringement of the Pet-Ag Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

178.    Pet-Ag is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, Pet-Ag will suffer irreparable harm.

179.    Pet-Ag is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Pet-Ag Trademarks.

### SECOND CAUSE OF ACTION
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

180.    Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

181.    As set forth above, Defendants are selling non-genuine products bearing the Pet-Ag Trademarks that are materially different from genuine Pet-Ag products.

182.    Defendants' sale of non-genuine products bearing the Pet-Ag Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Pet-Ag when they are not.

183.    Defendants' sale of non-genuine products bearing the Pet-Ag Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Pet-Ag products when they are not.

184.    Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

185.    Pet-Ag is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Pet-Ag will suffer irreparable harm.

186.    Pet-Ag is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

### THIRD CAUSE OF ACTION
**Violation of the Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS 510/1 – 510/7**

187.    Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

188.    Pet-Ag is the owner of the Pet-Ag Trademarks.

189.    Pet-Ag has registered the Pet-Ag Trademarks with the United States Patent and Trademark Office.

190.    The Pet-Ag Trademarks are valid and subsisting trademarks in full force and effect.

45

191.    Defendants willfully and knowingly used, and continue to use, the Pet-Ag Trademarks in interstate commerce, including through their product listings on Amazon, for the purpose of advertising, promoting, and selling products bearing the Pet-Ag Trademarks without Pet-Ag's consent.

192.    Defendants' advertisements and promotions of products unlawfully using the Pet-Ag Trademarks have been disseminated to the relevant purchasing public.

193.    Defendants use the Pet-Ag Trademarks with the intent that consumers will rely on their use of the Pet-Ag Trademarks and believe that they are selling genuine Pet-Ag Products.

194.    Pet-Ag has not authorized Defendants to advertise, promote, or sell products bearing the Pet-Ag Trademarks, and Pet-Ag does not know the source of the products Defendants are/have been selling.

195.    The products Defendants advertise, promote, and sell bearing the Pet-Ag Trademarks are not covered by the Pet-Ag Satisfaction Guarantee.

196.    Pet-Ag has established substantial quality control procedures that genuine Pet-Ag Products must comply with.

197.    Pet-Ag abides by these quality control procedures and requires all Authorized Sellers to abide by them as well.  Pet-Ag's quality controls are legitimate and material, as they protect consumers from receiving poor quality products that could harm them. When a consumer considers whether to purchase a product bearing the Pet-Ag Trademarks, the applicability of Pet-Ag' quality controls to the product is relevant and material to the consumers' purchasing decision.

198.    The products bearing the Pet-Ag Trademarks that Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Pet-Ag's quality controls and customer service requirements.

46

199.    Because the products Defendants advertise, promote, and sell bearing the Pet-Ag Trademarks are not covered by the Pet-Ag Satisfaction Guarantee, and are not subject to, do not abide by, and interfere with Pet-Ag's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Pet-Ag Products sold by Authorized Sellers.

200.    Because the products Defendants advertise, promote, and sell bearing the Pet-Ag Trademarks are materially different from Pet-Ag Products sold by Authorized Sellers, the products Defendants sell are not genuine Pet-Ag Products.

201.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks interfere with Pet-Ag's quality controls and ability to exercise quality control over products bearing the Pet-Ag Trademarks.

202.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks are likely to cause confusion, cause mistake, and/or deceive consumers because Defendants' use of the Pet-Ag Trademarks suggests that the products Defendants offer for sale are subject to and compliant with Pet-Ag's quality controls when, in fact, they do not and are not.  Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Pet-Ag Trademarks suggests that the products Defendants offer for sale are genuine Pet-Ag Products when, in fact, they are not.

203.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks are likely to cause confusion or misunderstanding among consumers because Defendants' use of the Pet-Ag Trademarks suggests that the products Defendants offer for sale are sourced from, sponsored by, approved by, or certified by Pet-Ag when, in fact, they are not.

47

204. Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks are likely to cause confusion or misunderstanding among consumers because Defendants' use of the Pet-Ag Trademarks suggests that the products Defendants offer for sale are affiliated with, connected with, associated with, or certified by Pet-Ag when, in fact, they are not.

205. Defendants' unauthorized and deceptive use of the Pet-Ag Trademarks is material and likely to influence customers to purchase the products Defendants sell, as consumers are likely to believe that products Defendants advertise using the Pet-Ag Trademarks are genuine Pet-Ag Products that are subject to, and abide by, Pet-Ag's quality-control requirements and come with benefits associated with genuine Pet-Ag Products when, in fact, they do not.

206. Defendants' unauthorized use of the Pet-Ag Trademarks in advertising and otherwise infringes the Pet-Ag Trademarks.

207. Defendants' use of the Pet-Ag Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Pet-Ag Trademarks is a deceptive trade practice under 815 ILCS 510/2. As a result of Defendants' conduct, Pet-Ag has suffered, and continues to suffer, immediate, and irreparable harm. This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will remain on Amazon permanently, harming Pet-Ag's reputation among consumers and placement in online search results.

208. Pet-Ag has also suffered, and continues to suffer, damages including, but not limited to, loss of business, diminished goodwill, reputational harm, and decreased profits in an amount to be proven at trial.

209.    Pursuant to 815 ILCS 510/3, Pet-Ag is entitled to an injunction enjoining Defendants' unlawful conduct, and an award of attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Common Law Trademark Infringement

210.    Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

211.    Pet-Ag is the owner of the Pet-Ag Trademarks.

212.    Pet-Ag has registered the Pet-Ag Trademarks with the United States Patent and Trademark Office.

213.    The Pet-Ag Trademarks are valid and subsisting trademarks in full force and effect.

214.    The Pet-Ag Trademarks are distinctive and widely recognized by the consuming public. Pet-Ag Products are sold and purchased through its Authorized Sellers throughout the United States, including in Illinois.

215.    Pet-Ag is widely recognized as the designated source of goods bearing the Pet-Ag Trademarks.

216.    Defendants willfully and knowingly used, and continue to use, the Pet-Ag Trademarks in interstate commerce for purposes of selling products bearing the Pet-Ag Trademarks without Pet-Ag's consent.

217.    The products bearing the Pet-Ag Trademarks that Defendants sell are not authorized for sale by Pet-Ag.

218.    Defendants' use of the Pet-Ag Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products

legitimately bearing the Pet-Ag Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Pet-Ag when they are not.

219.   Defendants' use of the Pet-Ag Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Pet-Ag products.

220.   The products sold by Defendants are not, in fact, genuine Pet-Ag products.  The products sold by Defendants are materially different from genuine Pet-Ag products because, among other reasons, they are ineligible for the Pet-Ag Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Pet-Ag's quality control requirements.

221.   Defendants' unauthorized use of the Pet-Ag Trademarks has infringed upon and materially damaged the value of the Pet-Ag Trademarks, and caused significant damage to Pet-Ag's business relationships.

222.   As a proximate result of Defendants' actions, Pet-Ag has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

223.   Pet-Ag is entitled to recover its damages caused by Defendants' infringement of the Pet-Ag Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

224.   Pet-Ag is entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Pet-Ag's rights.

**FIFTH CAUSE OF ACTION**
**Tortious Interference with Existing Contracts and Business Relationships**

225. Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

226. Pet-Ag products are sold to the public exclusively through Pet-Ag's network of Authorized Sellers.

227. Pet-Ag has entered into valid and enforceable agreements with its Authorized Sellers to sell Pet-Ag Products. These agreements specifically prohibit Authorized Sellers from selling Pet-Ag Products to unauthorized resellers such as Defendants.

228. Defendants are not Authorized Sellers of Pet-Ag Products. Despite this, Defendants have sold and are continuing to sell a high volume of products bearing the Pet-Ag Trademarks on the Internet. The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.

229. Thus, upon information and belief, Defendants have purchased Pet-Ag products from Authorized Sellers for the purpose of reselling them on the Internet.

230. By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Pet-Ag.

231. Defendants have known that Pet-Ag's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

232. Defendants have known of this prohibition, among other reasons, because Pet-Ag informed Defendants of this prohibition in a cease-and-desist letter it mailed to Defendants on July 26, 2021.

51

233. Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Pet-Ag's agreements with its Authorized Sellers by continuing to induce Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

234. In interfering with Pet-Ag's agreements, Defendants acted without justification and with a wrongful purpose. Defendants purchased Pet-Ag products from Authorized Sellers —and in so doing, instigated a breach of Authorized Sellers' agreements with Pet-Ag—so that Defendants could unlawfully infringe upon and materially damage the value of the Pet-Ag Trademarks by reselling the products on the Internet, thereby committing an independent tort.

235. Pet-Ag's agreements with its Authorized Sellers are a specific class of contract that Defendants are causing Authorized Sellers to breach when they purchase products from Authorized Sellers for resale. Although Pet-Ag does not yet know which specific Authorized Seller(s) have breached their agreements with Pet-Ag—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for Pet-Ag's claim of tortious interference.

236. Defendants are not parties to the contracts they caused Authorized Sellers to breach.

237. Defendants' actions have caused injury to Pet-Ag for which Pet-Ag is entitled to compensatory damages in an amount to be proven at trial.

238. The injury to Pet-Ag is immediate and irreparable, as Pet-Ag's reputation and relationships have been damaged among its consumers and Authorized Sellers.

239. Pet-Ag is also entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Pet-Ag's rights.

## PRAYER FOR RELIEF

WHEREFORE, Pet-Ag prays for relief and judgment as follows:

A. Judgment in favor of Pet-Ag and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B. Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

   i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Pet-Ag Trademarks;

   ii)   Prohibiting the Enjoined Parties from using any of the Pet-Ag Trademarks in any manner, including advertising on the Internet;

   iii)  Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Pet-Ag Trademarks;

   iv)   Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any

products sold by them which contain the Pet-Ag Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Pet-Ag's products, or any of the Pet-Ag Trademarks;

vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Pet-Ag Trademarks which associate Pet-Ag's products or the Pet-Ag Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)     Requiring the Enjoined Parties to take all action to remove the Pet-Ag Trademarks from the Internet, including from the website www.amazon.com; and

viii)     Requiring the Enjoined Parties to destroy or return to Pet-Ag all products bearing the Pet-Ag Trademarks in their possession, custody, or control.

C.     An award of attorneys' fees, costs, and expenses.

D.     Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Pet-Ag demands a trial by jury on all issues so triable.

Dated: April 20, 2022                    Respectfully submitted,

                                         */s/ Daniel C.F. Wucherer*
                                         Daniel C.F. Wucherer
                                         VORYS, SATER, SEYMOUR AND PEASE LLP
                                         301 E. 4th Street, Suite 3500
                                         Cincinnati, OH 45202
                                         Tel: (513) 723-4093; Fax: (513) 852-7811
                                         dcwucherer@vorys.com

                                         Matthew Jason Singer
                                         MATT SINGER LAW, LLC
                                         77 W. Wacker Drive, Suite 4500
                                         Chicago, IL 60601
                                         Tel: (312) 248-9123
                                         matt@mattsingerlaw.com

                                         **Attorneys for Plaintiff Pet-Ag, Inc.**